# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DEONDRICK LUCAS, TORY MINTON, SEYVEYON MOORE, AND DEONDRE TATE** | * * * * | **CIVIL ACTION NO.** |
| VERSUS | * * | **SECTION:** |
| **TROY LAWRENCE, JR. in his PERSONAL CAPACITY, MURPHY PAUL, in his INDIVIDUAL AND OFFICIAL CAPACITIES, BATON ROUGE POLICE   DEPARTMENT, CITY OF BATON ROUGE, AND  PARISH OF EAST BATON ROUGE** | * * * * * * | **JUDGE:** |

**************************************************************************

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come **DEONDRICK LUCAS, TORY MINTON,  SEYVEYON MOORE, AND DEONDRE TATE,** individuals the age of majority, residents of and domiciled and the Parish of East Baton Rouge, State of Louisiana, who with respect as follows:

I.      **INTRODUCTION**

1.

This action involves Baton Rouge's torture warehouse, known to the Baton Rouge Police Department's Street Crimes Unit as its now shuttered, "BRAVE Cave."  The full horror of what the Street Crimes Unit did there, however, is still coming to light.  Even those that were not physically beaten at the torture warehouse, we now know, were sexually humiliated; official Baton Rouge Police Department (hereinafter sometimes referred as "BRPD") policy green-lit, in writing, illegal strip searches of hundreds of detainees brought through the " BRAVE Cave," causing

Plaintiffs to suffer severe emotional distress, humiliation and anxiety, the extent of which is not yet known.

2.

This case involves the illegal detention, humiliation and traumatization of four young men brought to the "BRAVE Cave" on January 9, 2023 where each of the Plaintiffs, Deondrick Lucas - 19 years old, Seyveyon Moore - 19 years old, Tory Minton - 20 years old, and Deondre Tate - 33 years old were sexually humiliated, illegally stripped searched, traumatized and subjected to extreme emotional distress causing damages the extent of which are not yet known.

3.

The officer in whose custody they entered, Troy Lawrence, Jr., has an extensive record of injuring members of the public, disregarding their constitutional rights, and escalating routine interactions into hostile and even violent ones, all of which has cost the taxpayers of Baton Rouge a significant amount of money in civil rights lawsuits and departmental investigations.  His criminal conduct made national news, been flagged by federal judges and is well known to BRPD Chief Murphy Paul and members of the Metropolitan Council.

4.

Time and again, BRPD had been warned in 2021 and 2022 that by keeping Officer Troy Lawrence, Jr. on the force that they were all but guaranteeing a Baton Rouge citizen would be killed or seriously injured and subjected to conduct that was likely to cause injuries either physically or mentally.  BRPD's deliberate indifference to those warnings caused Plaintiffs' injuries at issue herein.

5.

Plaintiffs' injuries were inflicted at the torture warehouse known to BRPD as the "BRAVE Cave," a place where Baton Rouge citizens were taken, held incommunicado, denied counsel, and subjected to physical and emotional damages. Its existence has been known to top BRPD officials since long before Plaintiffs' detention at issue herein. It was shut down by the Mayor of Baton Rouge on August 29, 2023 after news of an impending lawsuit was broadcast on WAFB on August 28, 2023.

6.

On August 29, 2023, Officer Troy Lawrence, Jr. resigned from BRPD.

## II.    JURISDICTION AND VENUE

7.

This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiffs' rights as secured by the United States Constitution, as well as their deprivation of rights under Louisiana Law.

8.

This Court has jurisdiction pursuant to 28. U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and the events giving rise to the claims asserted herein occurred in this judicial district.

## III.    PARTIES

9.

Plaintiffs, Deondrick Lucas, Seyveyon Moore, Tory Minton and Deondre Tate are citizens of the Unites States and residents of Baton Rouge, Louisiana.

10.

Defendant, Troy Lawrence, Jr. is a resident of Louisiana and was employed by the BRPD during the time frame at issue herein. He worked for Defendants, Baton Rouge Police Department ("BRPD"), the City of Baton Rouge, and the Parish of East Baton Rouge.

11.

Defendant, City of Baton Rouge is a political subdivision of the State of Louisiana. The City's governing authority is consolidated with the government of East Baton Rouge Parish.

12.

Defendant, Parish of East Baton Rouge is a political subdivision of the State of Louisiana. The Parish's governing authority is consolidated with the City of Baton Rouge.

13.

BRPD, Chief Murphy Paul is the final policy maker for the municipal defendants as it pertains to official policy governing use of force, arrests, searches, and respect for the First Amendment Rights of Baton Rouge citizens by BRPD employees.

## IV.    PLAINTIFFS' FACTUAL ALLEGATIONS

14.

On January 9, 2023, Plaintiffs were outside of a location in the 5400 block of Cadillac Street, Baton Rouge engaging in social activities and eating crawfish when BRPD arrived at the location.

15.

Plaintiffs were arrested by BRPD officers including Officer Lawrence, without reasonable suspicion or probable cause.

4

16.

Plaintiffs repeatedly asked the BRPD officers why they were being arrested and were provided no response.

17.

The Louisiana Constitution provides, "When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest for detention."

18.

Plaintiffs were placed in the back of BRPD vehicles.

19.

At certain times during the arrest of Plaintiffs, while searching for and discussing possible evidence, certain officers including, but not limited to Officer Lawrence turned off the audio on their body worn cameras.

20.

Plaintiffs were forced to sit in the back of BRPD vehicles for a number of hours and at no time were read their rights or told under what charges they were being arrested.

21.

After several hours of being detained without having read the Plaintiffs their rights, the Plaintiffs were not transported to the police station, but to a torture warehouse known to BRPD's staff as the "BRAVE Cave."

22.

At the "BRAVE Cave," the Plaintiffs were put in a room with a bench and handcuffed to it.

23.

After being detained within this room at the "BRAVE Cave," the Plaintiffs were brought one by one into a room and questioned about being members of a gang.

24.

During their wrongful detention, each of the Plaintiffs were subjected to strip searches including search of their anal cavities and genitals. After another detainee, Jeremy Lee was beaten, the BRPD officers including, but not limited to Troy Lawrence, Jr. threatened the Plaintiffs with beatings including repeatedly making statements as to "whose next."

25.

Plaintiffs were not booked until 2:00 a.m. on January 10, 2023 and were never provided with a reason that the BRPD arrived at the Cadillac Street location or the reason that they were being detained.

26.

Plaintiffs' detention without having been advised fully of the reason for their arrest for detention was in violation of their constitutional rights pursuant to the Louisiana Constitution.

27.

Plaintiff, Deondrick Lucas was taken to the BRAVE Cave on a second occasion on May 22, 2023. On that date, Mr. Lucas was sitting in a vehicle in front of the Cadillac Street location with the homeowner. The homeowner had gone back into her residence to obtain a towel and slippers as Mr. Lucas and she were going to go swimming.

28.

Mr. Lucas was again arrested by BRPD officers without reasonable suspicion or probable cause. On this occasion, BRPD told Mr. Lucas that the homeowner had called and voiced a

complaint about his presence despite the fact that he was with the homeowner. It is obvious that BRPD officers fabricated the complaint.

29.

Mr. Lucas was taken to the BRAVE Cave at approximately 2:30 p.m. Where he was wrongfully detained without having his rights read to him. Mr. Lucas was capped at the brave Cave for approximately six hours where he was subjected to a strip search including all of his anal cavity and genitals. Mr. Lucas was not booked until later that evening when he was finally taken to the police station.

## V.     TROY LAWRENCE, JR.'S NEARLY PROVOKES A RIOT BY FIGHTING WITH BYSTANDERS

30.

As the police presence in the area where the Plaintiffs were illegally detained increased, a crowd gathered in the neighborhood around a local grocery store to see what was going on.

31.

Officer Lawrence stayed in the area with several other officers, periodically cutting his body cam audio off and on.

32.

Officer Lawrence and one woman got into a back-and-forth that consists of him telling her to "keep talking" and daring her to "show me."

33.

After arresting her, Officer Lawrence walked away from the scene for about half an hour.

34.

Instead of cooling off, Officer Lawrence returned to the crowd around the grocery store, which by this point had largely settled, ready to find, and if necessary, create further conflict.

35.

One woman asked an officer about the status of the search warrant for the home that was searched on Cadillac Street, and the reason the officers were in the area. The two had a civil back-and-forth.

36.

Officer Lawrence, however, stepped in and started to argue with the woman. Among his comments were "how are you going to tell me what I can do at my job and what I can't?"

37.

A male bystander then joined the conversation.

38.

Angered, Officer Lawrence called the woman "ignorant" and bragged about how much money he had.

39.

The comment caught the attention of several bystanders and elicited an immediate, negative reaction from the crowd.

40.

Sensing the sudden mood change in the crowd almost immediately following Officer Lawrence's arrival and provocation of bystanders, another BRPD officer had to step in and then separate Officer Lawrence from the now-agitated crowd.

41.

After being separated, Officer Lawrence tried to walk back over to the crowd to taunt them more, but two officers intervened to talk him down and walk him away.

42.

One officer explicitly told Officer Lawrence to "chill out."

## VI. TROY LAWRENCE, JR.'S TROUBLED HISTORY AND POLICYMAKERS DELIBERATE INTERFERENCE TO THE OBVIOUS CONSEQUENCES OF HIS RECURRING MISCONDUCT

43.

During Troy Lawrence, Jr.'s short tenure as a BRPD officer, his dangerous temper led to numerous Internal Affairs investigations.

44.

Numerous incidents have involved Troy Lawrence, Jr.'s needless escalating ordinary encounters, strip searching young Black men, and responding to criticism with violence.

45.

Troy Lawrence, Jr. is the son of BRPD Deputy Chief Troy Lawrence, Sr.

46.

Apart from Chief Murphy Paul, Deputy Chief Troy Lawrence, Sr., is currently the highest paid employee of BRPD.

47.

No BRPD employee with Troy Lawrence, Jr.'s seniority has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence, Jr.

48.

No BRPD employee has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence, Jr. in the past two years.

9

## VII.    **THE CLARENCE GREEN INCIDENT**

49.

Shortly after joining the force, Officer Lawrence's misconduct made national news when he strip searched a minor child in public; illegally searched the child's mother's apartment without a warrant and then threatened to beat a handcuffed detainee.

50.

Judge Brian A. Jackson even without being presented with evidence of Troy Lawrence, Jr.'s threats to beat Clarence Green described the January 1, 2020 incident as follows: "[T]he state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading Defendant's home (weapons drawn) to conduct an unjustified, warrantless search.  Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution, which protects citizens against unwanted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63."

51.

After the home search, when BRPD officers attempted to pressure Ms. Green into consenting to allow them to take a DNA sample from her minor child, Clarence Green (from the back of the police car) advised his mother to call a lawyer.

52.

Troy Lawrence, Jr. then threatened to beat Clarence Green while he was handcuffed and locked in the back of a police car, stating, "If you don't shut the fuck up, I'm going to come in and I'm going to fuck you up.  You think I'm playing with you?  I will fuck you up."

53.

During Judge Jackson's ruling on December 29, 2020, the filing of a civil rights lawsuit on January 2, 2021, a Baton Rouge Metropolitan Council's ratification of a $35,000.00 settlement on April 21, 2021 no disciplinary investigation into Officer Lawrence was even started until, at earliest, May 24, 2021.

54.

The investigation did not begin until after BRPD was contacted by a journalist who had reviewed the footage that was released by the Green family.

55.

The "disturbing" footage of Officer Lawrence's misconduct was featured on the national nightly news program CBC Evening News on May 27, 2021.

56.

On May 28, 2021, Chief Murphy Paul convened a press conference to address the national controversy caused by Troy Lawrence, Jr. and his colleagues.

57.

At the press conference, the first question posed by journalist was: "This happened almost 17 months ago. Would we be here talking about this today if that video had not come out?" Chief Paul responded, "Absolutely we would have . . . . we just had the last hearing, what was it, the 13[th] I believe? The 13[th] of this month was our last hearing. And we still have two other officers that we have not completed that investigative process. So yes, we still would have made that information available to the public once those administrative processes have concluded."

58.

Chief Paul omitted that the investigation into Officer Lawrence was not started before May 24, 2021. In fact, no investigation into Officer Lawrence was started as a result of Judge Jackson's ruling, the lawsuit, or the civil rights settlement.

59.

BRPD conducted an investigation into Officer Lawrence's role in the Green Family case and Chief Paul personally reviewed the results.

60.

BRPD cleared Officer Lawrence of any violation of a "use of force" or search-and-seizure policies in connection with the initial stop of, initial search of, and threatened violence against Clarence Green and his brother.

61.

BRPD Chief Paul personally defended the lawfulness and appropriateness of the strip searches of Clarence Green at a public press conference.

62.

On January 19, 2023, Officer Lawrence testified under oath about the aforementioned incident.

63.

Officer Lawrence swore that he "was suspended for cursing, using profanity."

64.

Officer Lawrence swore that he had no idea he was one of the "John Doe" defendants named in Clarence Green's civil rights suit.

65.

Officer Lawrence swore that he had no recollection of being featured on a national news broadcast or that Chief Paul had convened a press conference to discuss the incident in which he was involved.

66.

Officer Lawrence swore that he did not believe he had assaulted Clarence Green by threatening to "fuck him up" while he was handcuffed.

67.

Officer Lawrence received no additional training, counselling, or anger management in connection with the incident.

## VIII.    THE SHERMANIE REED INCIDENT

68.

Officer Lawrence also used force and violence against another motorist, Sharmaine Reed, who accurately told him he was acting unprofessionally on October 31, 2020.

69.

The similarities to this incident are striking.  In the Reed incident, Officer Lawrence arrived on the scene, began cursing at the parties, began pushing individuals who posed no physical threat to him, ordered motorists into their cars, ripped a motorist out of her car, falsely arrested her, swore out a self-serving police report, injured the civilian, and then released her.

70.

As in this case, Officer Lawrence grossly misinterpreted the details of the encounter in a police report (in subsequent Internal Affairs investigation).

13

71.

As in this case, BRPD insisted that Officer Lawrence's conduct was consistent with BRPD policy.

72.

BRPD conducted an investigation into the case and Chief Paul personally reviewed the results.

73.

Officer Lawrence's interview with Internal Affairs included numerous obvious false statements.

74.

The investigation cleared Officer Lawrence of all wrongdoing in that case apart from muting his body worn camera.

75.

In September 2021, Parish Attorney Andy Dodson was contacted by an attorney to alert him of Officer Lawrence's misconduct and to highlight misrepresentations in his Internal Affairs interview. The attorney's letter sought a meeting with Chief Paul regarding the incident.

76.

Andy Dodson did not respond to the attorney's letter advising him of Officer Lawrence's misconduct and misrepresentations.

76.

Ms. Reed sued Officer Lawrence and Chief Paul for false arrest, excessive force and First Amendment retaliation on October 30, 2021.

77.

Ms. Reed's complaint emphasized that Officer Lawrence already "boast[ed] a lengthy record of professional misconduct during his short career period."

78.

In numerous conversations in 2021 and early 2022, BRPD's attorney was advised that Officer Lawrence was likely to maim or seriously injure someone in a future incident if they failed to intervene.

79.

At Officer Lawrence's deposition on January 19, 2023 in that matter, he repeatedly lied about facts of the case.

80.

On January 21, 2023, BRPD's counsel was sent another letter highlighting examples of Officer Lawrence's perjury in his deposition and reiterating ongoing concerns, stating, "Officer Lawrence is going to seriously injure or kill someone if he remains on the force. It is disheartening to learn that, since the filing of [the Shermaine Reed] lawsuit, Officer Lawrence has been suspended at least three (3) additional times for on-the-job misconduct and is currently the subject of an internal investigation for additional police brutality in December 2022."

81.

Within two months of Officer Lawrence's deposition, BRPD agreed to a $55,000.00 settlement to resolve the claims arising from the incident.

82.

Ms. Reed was willing to settled for $40,000.00 and an apology, but BRPD refused to authorize the settlement.

83.

BRPD maintained that Officer Lawrence did nothing wrong apart from muting his body-worn camera during his encounter with Ms. Reed.

84.

Officer Lawrence received no additional training, counselling or anger management in connection with the Reed Incident.

85.

Throughout Shermaine Reed's lawsuit against Troy Lawrence, Jr. and the BRPD, the Department withheld information from their own lawyers regarding Officer Lawrence's misconduct. The Department even altered and redacted response of documents to hide the names of witnesses who would have pertinent information regarding Officer Lawrence's violent tendencies.

86.

Throughout the Reed Litigation, BRPD's counsel was repeatedly advised by Ms. Reed's counsel that Officer Lawrence posed an ongoing danger to the people of Baton Rouge and that it was likely he would physically injure and/or emotionally injure someone if he was not removed from the force.

## IX.    TROY LAWRENCE, JR. ALSO TRIED TO FIGHT HIS COLLEAGUES

87.

Officer Lawrence has twice been subject to Internal Affairs investigations for altercations with a 20-year-old veteran of BRPD Cody Gunter.

88.

On July 19, 2021, Officer Lawrence disregarded a direct order from Sergeant Cody Gunter, telling him, "I don't give a fuck who you are."

89.

Officer Lawrence was suspended for 25 days.

90.

On March 6, 2022, Officer Lawrence called Sergeant Gunter "a pedophile" and attempted to fight him in public.

91.

Officer Lawrence stated, "I'll fuck you up right here in front of everybody."

92.

Officer Lawrence then took off his vest and attempted to fight Sergeant Gunter, who walked away to deescalate the situation.

93.

Officer Lawrence then called Sergeant Gunter "a pussy" and told him he was going to "kick [his] ass."

94.

The events occurred in front of a group of college students.

95.

When Sergeant Gunter returned to his car, Officer Lawrence followed him yelling, "Get out of the car you pussy."

96.

Under oath, Sergeant Gunter explained to Internal Affairs that he believed Officer Lawrence was dangerous and that he did not want to work in his presence. He expressed his fear stating, "I don't know what he is capable of."

97.

Officer Lawrence was suspended for this incident, as well.

98.

In at least one of the incidents, Officer Troy Lawrence, Sr. was made aware of his son's wrongdoing as the incident was happening, and was asked by BRPD officials to intervene with his son.

99.

Officer Troy Lawrence, Sr. was told that his son would be arrested if he did not promptly report to superior officers in connection with one of his altercations with Sergeant Gunter.

## X.    ADDITIONAL INTERNAL AFFAIRS INVESTIGATIONS

100.

On December 22, 2022, a local television station reported a story entitled "BRPD opens Internal Investigation after Cell Phone Video captures violent Confrontation." *See*, https://www.wbrz.com/news/brpd-opens-internal-investigation-after-cell-phone-video-captures-violent-confrontation/.

101.

The video in question depicts Officer Troy Lawrence, Jr. repeatedly striking a handcuffed individual in the back of a police car.

18

102.

When questioned about the incident under oath on January 19, 2023, Officer Troy Lawrence, Jr. claimed to have no recollection of the incident and no knowledge of any Internal Affairs investigation into the incident.

103.

During his deposition, Officer Lawrence also revealed that he had been suspended on at least one other occasion in 2022.

## XI.    CHAVIS/SANDERS INCIDENT

104.

In yet another recent incident, Officer Lawrence publicly attacked two young Black men after they justifiably criticized him for acting unprofessionally.

105.

On October 8, 2022, Officer Lawrence picked a fight with two young men, Holden Sanders and Emanuel Chavis after BRPD officers shot their cousin, Malik Chavis.

106.

Officer Lawrence profanely ordered the men to leave the grounds of a hospital.

107.

When the men informed him that he was acting unprofessionally, he physically attacked both of them.

108.

The assault involved grabbing Holden Sanders by the neck and hair, as Officer Lawrence unsuccessfully sought to rip him out of his car.

109.

Other non-BRPD officers witnessed the attack, but refused to join in Officer Lawrence's brutality, even as he screamed at them, "Can y'all fucking help?! . . What the fuck are y'all doing?! You're not going to help?!"

110.

He also physically attacked their mother.

111.

Officer Lawrence sadistically placed extremely tight handcuffs on Emanuel Chavis, and in response to his repeated requests to loosen the cuffs, responded, "Well, whenever you fight with me . . . that's what happens."

112.

As in this case, Officer Lawrence made up false allegations that Chavis and Sanders engaged in criminal activity justifying his brutality.

113.

All criminal charges against both men were eventually dropped.

## XII.    BRPD'S LONG HISTORY OF RETALIATING AGAINST CRITICS AND FOSTERING A CULTURE OF IMPUNITY FOR POLICE VIOLENCE

114.

Officer Lawrence's long standing pattern of retaliating against those who tell him he was acting unprofessionally is par for the course.  It is precisely the same thing BRPD's Chief Murphy Paul has done throughout his tenure.

### A.    Clarence Green Retaliation

115.

When Officer Lawrence's wrongdoing in the Clarence Green matter became a national news story, BRPD filed a petition in state court seeking to have the Green Family's attorney held in contempt for releasing body worn camera footage. The statutory penalty for the type of contempt sought by the BRPD was up to six months imprisonment.

116.

In a 92-page opinion, Judge John W. deGravelles subsequently issued an injunction halting the prosecution, rejecting the applicability of "Younger abstention" and "find[ing] the overwhelming evidence in the case shows that the City/Parish acted in bad faith in the retaliation against Frampton for Frampton's issuance of a press release and video which casts BRPD in a bad light." *Frampton v. City of Baton Rouge/Par. of E. Baton Rouge*, 21-CB-362-JWD-SDJ, 2022 WL 90238, at *35 (M.D. La. Jan. 7, 2022).

117.

Baton Rouge taxpayers paid over $85,000.00 to settle the lawsuit.

118.

BRPD still maintains they did nothing wrong in retaliating against the attorney who served as a whistle blower in exposing Officer Lawrence's misconduct.

**B.    Alton Sterling Retaliation**

119.

In response to BRPD's misconduct, thousand of Louisiana residents protested BRPD in 2016.

120.

BRPD responded with mass arrests of the protestors.

121.

Protesters argued the arrests were in retaliation for their exercise of their First Amendment rights to criticize BRPD, and their Fourth Amendment rights.

122.

They asserted *Monell* claims against BRPD and Baton Rouge, arguing that the wrongdoing was not just the result of individual official wrongdoing, but rather a policy or custom attributable to Baton Rouge itself.

123.

This Court rejected Defendants' efforts to dismiss the protestors Monell claims. *See*, ruling and Order, *Imani v. City of Baton Rouge,* case 3:17-cv-00439-jwd-ewd, DKT. 347 (July 14, 2022).

124.

The City of Baton Rouge settled that case mid trial for $1,170,000.00.

C.    **Internal Whistle Blower Retaliation**

125.

After criticizing BRPD leadership, BRPD union Vice-President, Siya Creel was unlawfully terminated by BRPD Chief Murphy Paul.

126.

The Municipal Fire & Civil Service Board unanimously decided Creel was wrongfully terminated.

127.

East Baton Rouge City-Parish ultimately paid $90,000.00 to settle Creel's claims of retaliation.

128.

A veteran officer in BRPD Internal Affairs Division, John Dauthier also accused BRPD Chief Murphy Paul of internal wrongdoing, publicly claiming "blatantly partial doctrine for enforcing policies of the BRPD."

129.

Dauthier alleged that he was retaliated against in part because he criticized BRPD leadership, whereas other officers who were well-liked by BRPD leadership were either not disciplined or less severely disciplined for similar wrongdoing.

**D.    Systemic Failings**

130.

In April 2023, the non-profit news outlet VERITE released an extraordinary six-part Exposé called "In The Dark," documenting systemic BRPD violence and hostility towards those who question BRPD.  *See,* https://veritenews.org/tag/baton-rouge-police-department/(collecting stories).

131.

Among other revelations, VERITE reported that the sole police officer investigated for wrongdoing in connection with the 2016 protest was a BRPD officer who was investigated for questioning the legality of the police response at the protest as opposed to any BRPD officer who violated the rights of the protestors.

133.

This reporting was accurate.

134.

VERITE reported that 100% of the use-of-force complaints made in 2017 were adjudicated "exonerated" or "not sustained" by BRPD Internal Affairs.

135.

This reporting was accurate.

136.

The reporting also documented a department plagued by a culture of impunity, with meritorious citizen complaints regularly discarded.

137.

Apart from the minor errors that have since been included lagged as "corrections" to the public available articles, there are no inaccuracies in the VERITE reports.

**E.    Cover-Up of the "BRAVE Cave" Torture Warehouse and the Jeremy Lee Incident**

138.

Jeremy Lee is an individual who was also taken into custody by BRPD and Officer Lawrence on January 9, 2023 from the Cadillac Street location along with Plaintiffs. Mr. Lee was so badly beaten by Officer Lawrence and members of the BRPD that the local jail refused to admit him until he was treated by a nearby hospital. There he was treated for broken bones and other injuries.

139.

Mr. Lee's injuries were inflicted at the "BRAVE Cave" on the evening of January 9, 2023 while the Plaintiffs were also being wrongfully detained and subjected to extreme emotional distress.

24

140.

On January 17, 2023, Mr. Lee's mother emailed Chief Paul to alert him that her son was kidnapped and severely beaten by the arresting officers.

141.

Chief Paul personally called her back to acknowledge receipt of the complaint.

142.

Mr. Lee filed an Internal Affairs complaint against the arresting officers on April 18, 2023.

143.

Internal Affairs acknowledged receipt of the complaint on April 25, 2023.

144.

When local media inquired about the incident in late August 2023, BRPD representatives falsely stated no Internal Affairs complaint had been filed.

145.

No action whatsoever in the Lee matter was taken until a local television news station broadcasted a report about the torture warehouse and the impending lawsuit on behalf of Mr. Lee on August 28, 2023.

## XII.    PLAINTIFFS' CAUSES OF ACTION

### COUNT I

### 42 USC § 1983-Fourth Amendment Excessive Force

146.

Plaintiffs repeat and reallege all the Paragraphs in this Complaint as if fully set forth herein.

147.

As more fully described above, Defendant, Troy Lawrence, Jr. and other members of the BRPD who will be identified during the course of discovery deprived Plaintiffs of their constitutional right to be free from excessive force.

148.

Defendant Troy Lawrence, Jr. and other members of the BRPD used excessive force when they forcibly arrested and strip-searched them. The force was excessive to the need (which was none, given Plaintiffs' explicit willingness to compliance) and was objectively unreasonable.

149.

As a direct and proximate result of this deprivation of their constitutional right to be free from excessive force, Plaintiffs sustained injuries, including but not limited to, significant emotional distress.

## COUNT II

### 42 USC § 1983-Fourth Amendment Unreasonable Search

150.

Plaintiffs repeat and reallege all of the Paragraphs in this Complaint as if fully set forth herein.

151.

As more fully described above, Defendant Troy Lawrence, Jr. and other members of the BRPD deprived Plaintiffs of their constitutional right to be free from unreasonable searches.

152.

Through claiming Plaintiffs were merely "detained" at the time they performed a violent and invasive strip-search on them, grabbing their genitals and pulling their pants down. This far

exceeded the limits of a "Terry Frisk" that would be permissible absent of full custodial arrest and was unlawful under Louisiana law, as well.

153.

As a direct and proximate result of this deprivation of his constitutional right to be free of unreasonable searches, Plaintiffs suffered injuries, including, but not limited to significant emotional distress.

## COUNT III

### 42 USC § 1983-Fourth Amendment Unreasonable Seizure

154.

Plaintiffs repeat and reallege all the allegations in this Complaint as if more fully set forth herein.

155.

As more fully described above, Defendant Troy Lawrence, Jr. and other members of the BRPD deprived Plaintiffs of their constitutional right to be free from unreasonable seizure.

156.

Defendants arrested Plaintiffs without a warrant and without probable cause to believe they committed a criminal offense and held them incommunicado at the "BRAVE CAVE" for purposes of illegally detaining them and subjecting them to emotional distress.

157.

As a direct and proximate result of this deprivation of their constitutional right to be free from unreasonable seizures, Plaintiffs suffered injuries, including, but no limited to significant emotional distress.

27

## COUNT IV

### 42 USC § 1983-*Monell* Liability for Each of the
### Foregoing Constitutional Violations (COUNTS I – III)

158.

Plaintiffs repeat and reallege all of the Paragraphs in this Complaint as if fully set forth herein against BRPD and all municipal Defendants.

159.

Plaintiffs further allege that BRPD maintains and implements formal written unwritten policies regarding use-of-force, strip-searches, and responses to citizen criticism that caused constitutional violations alleged in this Complaint. This included the formal BRPD policy of maintaining a torture warehouse known as the "BRAVE Cave" where constitutional deprivations are commonplace.

160.

Plaintiffs further allege that there is a pattern, practice, custom, and informal policy of false arrests, illegal searches, excessive force, and retaliation as BRPD; that this widespread reoccurring practices so permanent and settled that it constitutes formal policy; and that adherence to that practice caused the constitutional violations at issue in this Complaint. This includes, but is not limited to, the maintenance of a torture warehouse known as the "BRAVE Cave" where constitutional deprivations are commonplace.

161.

Plaintiffs further allege that Officer Lawrence was inadequately trained; that his inadequate training caused their constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

162.

Plaintiffs further allege that Officer Lawrence was inadequately supervised; that this inadequate supervision caused the constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

163.

Plaintiffs further allege that Officer Lawrence was inadequately disciplined; that his inadequate discipline caused the constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

164.

Plaintiffs further allege that Officer Lawrence's conduct has been authorized, approved, and ratified by Chief Murphy Paul, who holds final policy making authority for BRPD in relevant fields.

## COUNT V

### 42 USC § 1983-Failure to Intervene

166.

It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence and a police officer may be held liable under Section 1983 if he "fails or refused to intervene when a constitutional violation such as an unprovoked beating takes place in his presence."  In the instant matter, BRPD officers failed to intervene when other BRPD officers used excessive force including, but not limited to, performance of a violent and invasive strip-search which far exceeded the limits of a "Terry Frisk" which would be permissible absent a full custodial arrest and was unlawful under Louisiana law, as well.

## COUNTS VI, VII, VIII & IX

### State Law Claims-Assault, False Imprisonment, Defamation & Negligence

167.

Plaintiffs repeat and reallege all of the Paragraphs in this Complaint as if fully set forth herein.

168.

As more fully described above, Plaintiffs assert State law claims of assault (Count VI) and false imprisonment (Count VII) against Officer Lawrence and other members of the BRPD in violation of Louisiana law. They allege that Lawrence and other members of the BRPD defamed them (Count VIII) when filing false police reports against them. They allege that Officer Lawrence and other members of the BRPD are liable for negligence that proximately caused their injuries (Count IX). These claims include all the previous alleged wrongdoing discussed above.

## COUNT IX

### Respondeat Superior

169.

Plaintiffs repeat and reallege all the Paragraphs in this Complaint as if fully set forth herein.

170.

At all times, the individual Defendants and members of the BRPD to be identified during the course of discovery were acting in the course and scope of employment as Baton Rouge Police Department officers and were under the control, direction and supervision of their employer. Defendants BRPD and City-Parish of Baton Rouge are liable for the aforementioned State law torts under the doctrine of Respondeat Superior.

171.

Plaintiffs have been injured by the foregoing, having suffered severe emotional injuries, the extent of which has yet to be revealed.

**WHEREFORE,** Plaintiffs pray that this Court enter Judgment in their favor and against Defendants. Plaintiffs pray for the awarding compensatory damages, costs and attorney's fees against all the Defendants, and punitive damages against all Defendants, and for such further and additional relief as this Court may deem appropriate and just. A jury trial is demand on all issues.

Respectfully Submitted:

Douglas R. Kraus #26668
Susannah C. McKinney #24349
*Brener & Kraus, LLC*
1627 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 302-7802
Facsimile: (504) 302-4759
*dkraus@brenerlawfirm.com*
*smckinney@brenerlawfirm.com*
**Attorneys for Plaintiffs, Deondrick Lucas,
Seyveyon Moore, Tory Minton and
Deondre Tate**